**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

JOHN DOE,                                                      :

                                  :   **Civil Action No:** 3:17-CV-1285 (TJM/DEP)

               **Plaintiff,**                             :

                                  :

                                  :   **COMPLAINT**

             **-against-**                               :

                                  :   **JURY TRIAL DEMANDED**

CORNELL UNIVERSITY,                                   :

                                  :

                                  :

                 **Defendant.**                             :

-----------------------------------------------------------------X

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.      This case arises out of the actions taken and procedures employed by Defendant Cornell University in investigating and adjudicating a complaint of sexual misconduct filed by Jane Roe[2] (the "Complainant" or "Roe") alleging that Doe had non-consensual sexual contact with her in the early morning hours of December 6, 2014 ("the Complaint").

2.      Roe attended a party on the night of December 5, 2014, and was heavily intoxicated. Her friends had to support her body as they walked her home from the party. She vomited several times, and finally passed out in her dorm room.

3.      Doe, a close friend of Roe's, volunteered to watch over her. He slept on her floor for approximately three hours, and left before she woke up.

4.      Nearly five months later, Roe suddenly and inexplicably accused Doe of having sexually assaulted her in her bed that night.

---

[1] Plaintiff has filed a motion to proceed pseudonymously.
[2] Roe is referred to herein pseudonymously.

5.      Doe consistently and credibly denied that he had done anything other than stay in Roe's room to make sure she did not become dangerously ill from alcohol consumption. He even voluntarily took a polygraph examination that indicated he was being truthful in his denials.

6.      Nevertheless, Defendant was determined to find Doe responsible for sexual assault. On information and belief, Defendant was predisposed to protect a female alleged victim – particularly one who was extremely drunk – and to assume the guilt of an accused male, on the basis of biased assumptions about male behavior.

7.      Alternatively, on further information and belief, Defendant was predisposed to assume Doe's guilt based on his race, national origin, and religion.

8.      Throughout the investigation of the Complaint, Defendant engaged in substantial procedural errors in violation of the University's own policies, as well as state and federal law. Without limitation, Defendant deprived Doe of a hearing, including the right to present his case before an impartial panel and to cross-examine witnesses and challenge his accuser; demonstrated a gender bias against Plaintiff as the male student accused of sexual misconduct; and demonstrated racial and religious biases against Plaintiff, a Bangladeshi Muslim, resulting in an erroneous finding of responsibility and an unwarranted one-year suspension.

9.      As a result of Defendant's actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, as well as economic injuries and the loss and/or delay of educational and career opportunities.

10.     Accordingly, Plaintiff brings this action to obtain relief based on causes of action for violation of Title IX of the Education Amendments of 1972, breach of contract, and other state law causes of action.

## THE PARTIES

11.     Plaintiff John Doe is a natural person and resident of the State of New York. At all relevant times herein, Plaintiff was a student at Cornell University and resided in on-campus housing.

12.     Defendant Cornell University ("Cornell" or the "University") is an educational corporation organized and existing under the laws of the State of New York. It is a federal land-grant university with its principal place of business located in Ithaca, New York. The University is organized into seven undergraduate colleges, three of which are state-supported statutory or contract colleges through the State University of New York (SUNY) system, and seven graduate divisions.

## JURISDICTION AND VENUE

13.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

14.     This Court has personal jurisdiction over Defendant Cornell University on the grounds that it is conducting business within the State of New York.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Hamilton is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      Agreements, Representations, Covenants &
         Warranties Between Plaintiff and Cornell**

16.      John Doe was born in Bangladesh and moved to the United States when he was 14 years old.  He is a naturalized American citizen and a practicing Muslim.

17.      Doe graduated from a high school in the New York City area in June of 2012. He excelled academically and was an Honor Roll student. He was also involved in his school and community; he played varsity soccer, volunteered for Habitat for Humanity, and tutored elementary and middle school students at his local public library.

18.      Prior to April of 2015, Doe never had any disciplinary problems, academic or otherwise, whether at Cornell or at any other institution.

19.      Doe was enrolled at Cornell in the College of Agriculture and Life Sciences ("CALS"). CALS is the second largest undergraduate college at Cornell. Doe graduated from CALS in May of 2017.

20.      At all times relevant to this lawsuit, Doe intended to apply for and attend medical school upon graduation from Cornell, and to become a practicing medical doctor thereafter.

21.      While at Cornell, Doe was involved in a number of activities. He was captain of the intramural soccer team and a member of a student group called Energy Corps, which focused on reducing energy inefficiency across the Cornell campus. He was also a member of the CALS ambassador program, through which he met with prospective students and served as the liaison between the CALS admissions committee and the prospective students. He was a voting student member of the Academic Achievement and Petitions Committee. He finished his last two semesters at Cornell as a Dean's List student.

22.     Prior to becoming the victim of unlawful, biased, arbitrary and capricious disciplinary actions at the hands of Cornell and its administrators, Doe had a strong academic record and a stellar reputation in the Cornell community.

23.     Upon his acceptance to Cornell, John Doe was provided online access to copies of Cornell's school policies, including the Campus Code of Conduct (the "Code"), as amended on September 26, 2014, and Policy 6.4, which has since been amended (collectively, the "Policies").

24.     These Policies set forth the procedures by which Cornell students who have been accused of violating one or more of the enumerated Policies are investigated, heard, and, possibly, disciplined.

25.     On information and belief, Cornell's policies for handling complaints of sexual assault changed at least three times between 2012, when Doe began his studies at Cornell, and 2017, when he graduated.

26.     The changes in 2012, just prior to Doe's matriculation, resulted in severely diminished procedural rights and safeguards for students accused of sexual misconduct.

27.     For example, until the spring of 2012, Cornell utilized a "clear and convincing" evidence standard when evaluating student complaints of sexual assault. It also provided students accused of sexual misconduct with the right to a hearing under the procedures set forth in the University's Code of Conduct.

28.     However, on April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter ("DCL"). The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed

schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

29.     OCR also made clear that colleges and universities were to adjudicate complaints of sexual harassment, including sexual assault, under the less onerous "preponderance of evidence" standard.

30.     Thus, in April of 2012 – in response to the DCL, as well as increased student protests concerning the "rape culture" on Cornell's campus and Cornell's ineffective and insufficient response to allegations of sexual violence – Cornell lowered the standard of proof to a "preponderance of evidence" and eliminated the right to a hearing for allegations involving student sexual misconduct. *See*, *e.g.*, *President Skorton approves resolution on student sexual violence cases*, April 25, 2012 (available at [http://news.cornell.edu/stories/2012/04/skorton-approves-resolution-student-sexual-violence-cases](http://news.cornell.edu/stories/2012/04/skorton-approves-resolution-student-sexual-violence-cases)).

**II.     Cornell's Inconsistent Disciplinary Policies**

31.     During the 2014-2015 academic year, the versions of Cornell's Campus Code of Conduct and Policy 6.4 then in effect provided inconsistent and irreconcilable procedures to students accused of misconduct, depending on the type of misconduct alleged.

32.     Specifically, Cornell's Code of Conduct provided the following non-exhaustive rights to a student accused of sexual misconduct:

- The right to a hearing before a hearing panel composed in part of fellow students;

- The right to have evidence examined under a clear and convincing standard of proof;

- The right to question witnesses; and

- The right to confront one's accuser.

33.     Significantly, *none* of the foregoing procedural guarantees was afforded to a student accused of sexual misconduct under the 2014-2015 version of Policy 6.4.

34.     Policy 6.4 is appended to Cornell's Code of Conduct and addresses Cornell's obligations under Title IX of the Education Amendments of 1972.

35.     Policy 6.4 broadly defines "sexual violence" as "physical acts perpetrated without affirmative consent or when a person is incapable of giving affirmative consent.  A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. All such acts of sexual violence are forms of sexual harassment that are covered under Title IX."  Policy 6.4 at p. 10.

36.     During the pendency of the investigation in this matter, Policy 6.4 utilized the so-called "single investigator" model for complaints of sexual misconduct against students, which allows one individual to act as judge, jury and executioner, and does not provide for a hearing. *Id.* at p. 21.

37.     Policy 6.4, as it existed during the 2014-2015 academic year, thus substantially limited an accused student's fundamental rights during the investigative process, notwithstanding the oftentimes more serious nature of the charges considered under this policy, namely, sexual misconduct, including assault and rape.

38.     Under the single investigator model, Cornell appointed an individual investigator who was responsible for conducting an investigation into allegations of sexual misconduct, making findings of fact, and recommending corrective action.

39.     The investigator was to complete the investigation within 60 days, unless good cause was shown for an extension.  *Id.* at p. 21.

40.     In academic year 2014-2015, Policy 6.4 explicitly denied an accused his fundamental rights to fair process: "Adversarial hearings (including confrontation, cross-examination by the parties, and active advocacy by attorneys) are not permitted during the investigation process." *Id.*

41.     After completion of the investigation, the investigator produced "a written report," which included: the scope of the investigation; a summary of the findings; recommendations for any corrective actions and/or sanctions; any non-punitive, preventative remedies for the complainant; and, if warranted, recommended action to restore the accused's reputation. *Id.* at p. 22.

42.     The investigator sent the report to a three-person review panel, made up of three faculty members, which then decided the ultimate fate of the accused. Notably, the review panel did not hear live testimony or question witnesses before considering the outcome. *See id.* at p. 22-23.

43.     Thus, while Cornell had, at all times relevant hereto, the ability to adopt and enforce due process protections in student disciplinary proceedings involving sexual misconduct – as demonstrated by its implementation of the Code of Conduct, as well as Appendix C to Policy 6.4 – it pursued the Complaint filed by Roe against Doe under a flawed system that denied Doe some of the most basic procedural rights and protections.

## III.     New York State Education Law Article 129-B and Due Process

44.     Not only did Cornell have the ability to adopt and enforce due process protections for *all* students involved in disciplinary proceedings at the University, it had the legal obligation to do so as of October of 2015.

45.     On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015.

46.     Art. 129-B was passed, *inter alia*, to provide a fair and consistent administrative process to students in higher education accused of sexual assault, domestic violence, dating violence or stalking.

47.     Art. 129-B provides students accused of sexual assault, domestic violence, dating violence or stalking with the "right to a process in all student judicial conduct cases…that includes, *at a minimum* … an opportunity to … present evidence and testimony at a hearing, where appropriate, and have access to a full and fair record of any such hearing."

48.     Art. 129-B also mandates that the accused has a right to "a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely and thorough manner by individuals who receive annual training in conducting investigations of sexual violence…including the right to a presumption that the respondent is 'not responsible.'"

49.     Art. 129-B further requires an "investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest."

50.     In accordance with 129-B, Cornell again revised its Policies in or around October of 2015.

IV.     **Cornell's Judicial Codes Counselor Sheds Light on its Broken Disciplinary System**

51.     In June of 2015, during the early stages of the investigation into the Complaint against Doe (described in further detail below), Cornell's Judicial Codes Counselor (the "JCC"), which is responsible for defending Cornell students accused of misconduct, issued a scathing

9

annual report indicating that Cornell's disciplinary process as it then existed was rife with serious problems. *See* Cornell University School of Law, *Annual Report of the Judicial Codes Counselor, Academic Year 2013-2014*, at p. 18 (hereinafter "JCC Report").

52.     The JCC Report notes the prosecutorial stance of the Office of the Judicial Administrator ("OJA") (which is purportedly impartial) in dealing with male students accused of sexual misconduct; the bias and narrow-mindedness of Cornell's primarily female force of investigators; and the inability of students accused under Policy 6.4 to receive a fair hearing.

53.     The JCC Report further notes the discrepancy between the disciplinary process provided for in Cornell's Code of Conduct and the one outlined in Policy 6.4.

54.     Specifically, the JCC Report details the flaws in Cornell's Policy 6.4, noting: "the most deploring characteristics of investigations [under Policy 6.4] against students is their duration. On average, it takes the JA's office about five months (seven months including appeals) to complete a Title IX investigation, exceeding the federally-recommended timeline by three months. In some cases, it took ten months or longer." *JCC Report,* p. 2.

55.     In addition, "Rights for the accused under the Code of Conduct are completely different than those under Policy 6.4 and the respondent, arguably, has a better chance of prevailing under the Code…. Thus, the policy through which alleged misconduct is investigated and adjudicated may very well be outcome determinative." *Id.* at p. 71.

56.     Regarding timeliness under the Code of Conduct, the JCC Report states "[t]he Code recognizes that 'timely dealing with alleged misconduct is vital'…Accused parties often experience tremendous anxiety while cases are pending.  During the reporting period, some JCC cases were open for unreasonable time periods, such as for the majority of the academic year." *Id.* at p. 12.

57.     The JCC report further observes: "in its effort to swiftly revise its procedures and crack down on sexual misconduct, Cornell has implemented a policy far beyond what is necessary to comply with OCR's guidance and created a process fraught with inequities.  *Id.* at p. 18.

58.     The JCC Report also notes a troubling development in Cornell's investigation of cases under Policy 6.4.  In one case, "[t]he investigator based her finding of guilt entirely on the perceived credibility of the parties.  The investigator determined that the complainant was the most credible…. What is curious about this particular case is that, after assessing the credibility of the parties according to an entirely subjective standard, the JA treated the *intuition* of the most credible party as *evidence*."  *Id.* at 20 n.73.

59.     Even more disturbing is the JCC's conclusion that "[t]he structure of the 6.4 process itself *reduces the likelihood of an outcome favorable to the accused*."  *Id.* at p. 24 (emphasis added).  This is because, in the words of the JCC, "The JA office is not an impartial environment."  *Id.*

60.     Notably, "[t]he requirement for a student to appear in the JA office indicates that, in the absence of additional information, there is already enough evidence to charge the student with a Code violation. When a JA associate meets with a student, the climate is inherently adversarial."  *Id.*  Further, "OCR guidance requires that a school's Title IX investigations 'must be adequate, reliable, *impartial*, and prompt.'  Where the organizational psychology of an office is prosecutorial, it is impossible to claim that it provides an impartial atmosphere."  *Id.*

61.     Also troubling is the JCC's note concerning Cornell's lack of male investigators. "Title IX claims are…investigated overwhelmingly, if not entirely, by women. Because respondents in 6.4 cases are usually men, this dynamic is troubling.  Respondents often feel

uncomfortable in an interview room of only women…which invariably affects body language and demeanor…. If a respondent's nervous behavior is misinterpreted, it may adversely affect his credibility rating." *Id.* at p. 36

62.     According to the JCC, Policy 6.4 unnecessarily eradicated the rights of students accused of sexual misconduct in several ways. *Id.*

63.     Per the JCC, "[n]o one may appear in person before the panel, precluding its direct evaluation of the credibility and demeanor of every witness involved in the case. Because the investigator [] is the only person who directly contacts the parties and witnesses, the panel relies on her impressions, and typically affords them great deference." *Id.* at p. 25.

64.     "Overlay onto this situation the skimpy preponderance standard, and the investigator is situated to decide cases based on her *gut feelings*.  When that investigator is a JA employee whose prosecutorial position may influence her judgment, a biased perspective disadvantages the respondent.  *Deprived of the opportunity to present a defense to the actual adjudicator, the accused doesn't have the option to expose his character to the panel or to answer questions that could lead to his exoneration.*"  *Id.* (emphasis added).

65.     The JCC Report further emphasizes that "[n]othing in OCR guidance requires a prohibition on appearing before the adjudicator in person.  Rather, OCR's guidance is replete with references to a 'hearing,' indicating that a procedure in which parties and witness appear before the adjudicating authority is acceptable." *Id.*

66.     Policy 6.4 further removes an accused's right to confront his accuser. "6.4 lacks positive language to protect the right of both parties to question each other through the investigator.  The investigator ultimately determines what will and what will not be asked, and

she is free to dismiss requests for interrogatives that, in her opinion, are not probative.  The accused thus faces another obstacle to his case." *Id.*

67.     Policy 6.4 likewise prohibits the parties from questioning third party witnesses. "The investigator, again, has control over every line of questioning and has the authority to decline requests (which are not even permitted in the policy) from the parties for specific interrogatives.  Any misstep or bias on the part of this single individual can therefore ultimately shape the course of the investigation and determine the final outcome of the case." *Id.* at p. 28.

68.     Plaintiff's case is an exemplar of Cornell discipline gone horribly wrong, as it mirrors the numerous problems outlined in the JCC Report with regard to the structure and implementation of Policy 6.4.

69.     On October 21, 2015, Cornell officials conceded the flaws in Policy 6.4 and announced that the University was working to revise the policy.

70.     Among the proposed changes were moving to a hearing model – a change in line with the mandates of Art. 129-B – and prohibiting a single investigator from making factual findings or recommendations.

**V.     Cornell's Revised Policy 6.4**

71.     On or about August 1, 2016, Cornell adopted a revised Policy 6.4 governing the investigation and adjudication of sexual misconduct complaints.

72.     The Revised Policy 6.4 differs from the previous policy under which Doe was investigated and disciplined in several significant respects, including:

> a.  All students accused of sexual misconduct are now afforded the right to a hearing before a three (3) member hearing panel. The Revised Policy 6.4 states: "The hearing is intended to provide the parties with a fair opportunity to present relevant information to the Hearing Panel and enable the Hearing Panel to make informed decisions regarding responsibility and sanctions/remedies."

13

    b.   Both parties are afforded the right to question witnesses at the hearing.

    c.   The investigator's role is now limited to gathering evidence and producing an investigatory report for the hearing panel; the investigator is no longer permitted to give recommendations or opinions regarding responsibility.

    d.   The Revised Policy specifies the scope of evidence to be gathered by the investigator which consists of: "relevant available evidentiary materials, including physical evidence, documents, communications between the parties, and other electronic records and media as appropriate."

    e.   The revised policy guarantees that the investigation "is designed to be timely, thorough, and impartial and provide for a fair and reliable gathering of the facts."

73.    Doe was denied the foregoing basic rights during the investigation and adjudication of the Complaint.

### VI.   <u>The Relationship Between John Doe and Jane Roe</u>

74.    While at Cornell, Doe became close friends with Jane Roe, who lived in Doe's dormitory. Doe thought of Roe as a member of his family, in part because Roe was younger than most students in her class year and in part because Roe reminded him of his own sister.  Doe sometimes jokingly referred to Roe as "my son" or "my daughter."

75.    Doe and Roe frequently talked, texted, and spent time together. They also shared many of the same friends. The friends, including Doe and Roe, often dined together and went to parties together.

76.    On December 5, 2014, Doe and Roe attended the same off-campus party, although they did not go together. They both consumed alcohol at the party, including beer and hard liquor.

77.    Roe, who is described by friends as "small" and unable to handle alcohol well, got very drunk and vomited at the party.

78.     Several of Roe's friends – including Roe's Resident Advisor ("RA"), SB, who also attended the party and drank alcohol there – walked Roe back to her dormitory around 12:30 or 1 a.m. on December 6, 2014.

79.     Roe's friends had to essentially "carry [Roe] from [the party] to West Campus" because "she really could not walk on her own." Roe was "slurring her words" and "her speech was incongruent because she was drunk."

80.     At the same time that Roe's friends were helping her get home, Doe was walking another student, YV, back to her residence.

81.     Doe and YV had kissed and touched each other earlier in the evening. They also kissed and touched each other on the walk back to YV's residence, but once they arrived, Doe did not stay there for more than a few minutes before heading back to his own dormitory.

82.     Meanwhile, at Roe and Doe's dormitory, SB helped Roe get to her bedroom, got Roe a trashcan in case she needed to vomit again, and stayed with Roe to watch over her.

83.     SB stayed with Roe "for at least an hour and a half" to make sure Roe was okay, since Roe was "so sick from alcohol."

84.     Doe returned to the dormitory while SB was still in Roe's room and offered to assist SB with Roe, who vomited at least once after returning to the dorm.

85.     Doe, a trained Emergency Medical Technician ("EMT"), said he would stay with Roe. SB agreed and left the room.

86.     Doe slept on Roe's floor from approximately 3 a.m. until around 6 a.m., at which point he got up and left. Roe was still sleeping when he left.

87.     Later that morning, Doe sent a text message to Roe asking her if she wanted to get brunch. Roe responded, "Haha I was looking for you…I'm in the dining hall." Doe and Roe, along with several other friends, had brunch together.

88.     SB checked in with Roe later in the day to see if she was okay, and told Roe that she had left her with Doe.

89.     Roe continued to text Doe in December, January, February, March and April, and continued to socialize, drink, and attend functions with Doe.

90.     Roe told Doe via text, in or around mid-December, 2014, that he was an "awesome friend."

91.     In March of 2015, Roe became highly intoxicated at a party she attended with Doe and other friends. Much like the night of December 5-6, 2014, Roe's friends again had to help Roe back to her dormitory because she was unable to safely function on her own. Doe, along with at least one other friend, took care of Roe after they returned to the dormitory.

92.     On April 4, 2015, Roe and Doe exchanged Facebook messages in which they talked about school, going to go to a "fancy" event together, and their favorite television shows.

93.     On or about April 7, Roe went to a "fancy event" – a gala – with Doe and at least one other mutual friend. Roe "wanted to go," and "did not want to go by herself."

94.     At no time did Roe indicate, between December 6, 2014, and April 27, 2015, that anything was amiss between her and Doe. In short, their friendship continued in a perfectly normal fashion.

**VII.   Roe's Allegations Against Doe**

95.     Then suddenly, at the end of April of 2015, Roe accused Doe of having sexually assaulted her in the early morning hours of December 6, 2014.

96.     According to Roe, she awoke in the middle of the night to find Doe in her bed. She and Doe were allegedly facing the same direction, yet somehow, according to Roe, Doe was able to kiss Roe on her mouth.

97.     Roe alleged that she told Doe "no," and that Doe stopped kissing her and began touching her breast instead. Roe told Doe "no," and Doe then moved his hand into Roe's pants, above her underwear. Roe again told him "no." At this point, Roe said she was on her back (though she did not recall how she got there) and Doe put his penis in Roe's mouth for 5-10 seconds before she turned her head because she needed to vomit.

98.     According to Roe, Doe then left the room and Roe "passed back out[.]"

99.     Roe first made these allegations to SB on April 27, 2015, and then to the Cornell University Police Department ("CUPD") on April 28, 2015.

100.    SB relayed Roe's allegations to the Assistant House Dean, JA, on April 27, 2015. JA reported the alleged assault to Judicial Administrator Mary Beth Grant ("Administrator Grant" or "Grant") the same day.

101.    On April 28, 2015, JA wrote a report detailing his conversation with SB, which he provided to Administrator Grant. JA said that SB told him the following:

> It happened about six months ago. [Roe] had too much to drink, and I brought her back to her room to look after her. She had thrown up. And [Doe] was there too. He kept telling me that it was ok, he would stay with her. And finally, I was like, alright. I thought it would be fine. They are friends. So I left them there. I was so stupid. [Roe] just told me tonight that after I left he sexually assaulted her.

102.    SB estimated that she stayed in Roe's room until approximately 3 a.m.

103.    On April 29, CUPD informed the Judicial Administrator that Roe had reported the matter to the police and requested that the Judicial Administrator hold off on investigating so that the police could move forward with their own investigation.

17

104.    CUPD and the OJA remained in contact during the pendency of the criminal investigation.

**VIII.    The Criminal Investigation**

105.    On April 29, 2015, at approximately 5 p.m., CUPD helped Roe make what is known as a "controlled phone call," in which the alleged victim contacts the alleged perpetrator on a recorded telephone line in an attempt to get the alleged perpetrator to inculpate himself.

106.    Doe was in the library studying for a final exam, which was scheduled for 7:30 that evening. Doe nevertheless took the time to talk with Roe, although he had to speak in a low voice so as not to disturb other students.

107.    During the call, Roe made the accusations described above. Doe agreed that he was in Roe's room on the date in question, but firmly and consistently denied the remainder of Roe's claims. When Roe asked him to explain why he had done these things to her, Doe repeated that he had not done them.

108.    CUPD took Doe into custody on April 30, 2015, as he left class.

109.    Two officers interrogated Doe for two hours; Doe agreed to speak to them without an attorney present, knowing he had nothing to hide. During the interrogation, Doe again denied that he had ever kissed, touched, or penetrated Roe, with or without her consent. He even agreed to take a polygraph examination to prove he was telling the truth.

110.    On or about May 10, 2015, the Cortland City Police Department administered a polygraph examination in which they asked Doe, in several different ways, whether he had ever put his penis in Roe's mouth. Doe denied that he had.

111.     The polygraph results indicated "no deception" in Doe's answers, meaning that he "passed." In other words, they indicated that Doe was telling the truth: he had not ever orally penetrated Roe.

112.     Notably, the police also questioned Doe on May 10 about his encounter with YV on December 5-6, 2014 (the same night Roe alleged Doe assaulted her). Doe readily acknowledged having had contact with YV, including touching her breasts, thus making it clear that Doe had no problem admitting to sexual contact that had actually occurred.

113.     The day after the polygraph, CUPD informed OJA that OJA could proceed with its own investigation.

114.     The Tompkins County District Attorney's Office declined to charge Doe, and CUPD closed its investigation.

115.     All of the materials from the CUPD investigation were thereafter turned over to Sarah Affel, Associate Judicial Administrator and Lead Investigator at the OJA ("Affel" or the "Investigator").

116.     Doe was then summoned to the OJA to meet with Administrator Grant, who informed Doe that Cornell was investigating Roe's allegations against him.

117.     At this meeting, Grant inquired whether Doe would like to immediately meet with Affel, whom she had assigned to investigate the matter.

118.     Grant did not initially tell Doe that he was entitled to have an attorney during the investigative process; it was only after he inquired what his options were that Grant told him he could get assistance from the JCC.

119.     Doe thus elected to meet with a member of the JCC prior to interviewing with Affel.

120.    Administrator Grant thereafter introduced Doe to Affel. Aside from this 30-second introduction, Affel never met with Doe in person during the course of the investigation into Roe's allegations against Doe. Instead, Affel's only substantive interactions with Doe were over Skype.

121.    Affel was at all relevant times aware that Doe is a person of color; that he is of Bangladeshi descent; and that he is a Muslim.

122.    As set forth below, Affel treated Doe less favorably than his accuser because of his gender. Affel also made unfounded and discriminatory assumptions about Doe's "tone," "choice of language," and behavior.

123.    Alternatively, and as set forth below, Affel treated Doe less favorably than his accuser because of his race, national origin, and religion.

## IX.    Cornell's Policy 6.4 Investigation

124.    Pursuant to the guidelines issued by the OCR, Cornell was required to conduct an "adequate, reliable, and impartial investigation."

125.    On information and belief, Defendant has recognized increased pressure, both internally and from the federal and New York State governments, to aggressively discipline male students accused of sexual misconduct under threat of rescission of federal and state funds.

126.    Indeed, on further information and belief, OCR has opened at least six inquiries into alleged mishandling of sexual assault investigations by Cornell University (four of which remain open as of the filing of this complaint), making it the college with the most active Title IX investigations in the nation.

127.    In the present matter, Defendant conducted an investigation and adjudication motivated by gender bias and discrimination against Doe. The investigation was replete with significant procedural violations that led to an erroneous finding of responsibility.

128.    Defendants also deprived Doe of the minimal requirements for procedural and basic fairness by utilizing Cornell's inherently flawed Policy 6.4, a process in which there was no cross-examination, no sworn testimony, no hearing of any kind, and no impartial consideration of evidence.

### Witness Interviews

129.    Pursuant to Policy 6.4, Affel began interviewing witnesses on May 14, 2015. In total, she interviewed ten people between May 14 and June 9, 2015.

130.    Of those witnesses who saw Roe on December 5, 2014, nearly all described Roe as being intoxicated to the point of vomiting. Roe herself admitted to being very drunk and throwing up.

131.    Only SB – Roe's RA and the person to whom Roe made her initial disclosure – tried to downplay Roe's level of intoxication, telling the investigator that Roe "looked a little drunk" at the party so SB walked her home. SB did not initially disclose to the Investigator that Roe threw up at the party.

132.    On information and belief, SB had a personal interest in downplaying Roe's level of intoxication. After a Cornell student died from excessive alcohol consumption in 2011 Cornell implemented strict rules for Resident Advisors to follow in the case of intoxicated dormitory residents. SB did not follow these strict rules on December 5-6, 2014, and indeed, was also intoxicated that night. Thus, SB risked losing her job as an RA – a job that carries excellent benefits, including free housing and discounted meals – if she was honest about Roe's true state.

133.    None of the witnesses, other than Roe and Doe, were in Roe's room during the time in question. Doe had been drinking that night, but was not so drunk that he was unable to remember what occurred. Roe, on the other hand, was extremely intoxicated, and her purported recall of the events just prior to the alleged assault vacillated dramatically during her interviews.

134.    In Roe's first interview with Affel, she said she and SB came back to her room because she was sick, and that SB "went to get her a trashcan and put her in bed." She then stated that she "knows this because [SB] told her this is what happened." SB also "told [Roe] that she sat with the complainant for about an hour and a half or two hours." Roe said she believed Doe arrived in her room at 3 a.m. and that she was asleep at the time, but she "only know[s] this because [SB] told me."

135.    Later, in the same interview, Roe switched courses and claimed that her last memory prior to waking up to Doe kissing her was "SB putting her to bed. She remembered that [SB] said that she was going to sit with her," and remembered SB "pulling a chair up to [her] bed." Yet she had *first* told the Investigator she had *no memory* of SB getting her a trashcan and putting her in bed – she said she only knew these things because SB told her about them.

136.    Then, in Roe's second interview, she told the Investigator that her last memory prior to falling asleep was SB "pulling out the chair" to sit by her bed.

137.    Incredibly – even though Roe had admitted having no memory of SB getting her a trashcan and putting her to bed on December 6, and even though Roe admitted she only "knew" those things because SB had told her about them – Roe claimed that there was no time during the evening of December 5-6 that she "lost memory as a result of drinking."

138.    By contrast, SB told Affel that her understanding was that Roe had no memories of her own concerning what occurred in her dorm room that night, at least until the point where Doe allegedly began assaulting her.

139.    The witnesses' accounts concerning events that occurred prior to the alleged assault also vary:

- As set forth above, Roe had no real memory of the events, although she reported going home from the party with SB.

- SB reported to Affel that she remembered leaving the party with Roe, YV, and another male student. She remembered walking Roe home, getting her a trashcan, helping her throw up, and sitting by her bed for one to two hours while she slept. SB said Doe arrived after Roe had already fallen asleep and told SB he could stay with Roe, whereupon SB left. SB did not remember CB – another witness and mutual friend of Doe and Roe – leaving the party with her and Roe.

- CB recalled walking back from the party with SB and Roe, and recalled having to "carry" Roe home because she "could not walk on her own." CB said that when they got back to Roe's dormitory they brought her to the bathroom, and that once CB realized SB had things under control, he went to his room. CB said he saw Doe "reappear" at the dormitory at some point, but he could not remember when.

- Doe remembered leaving the party with YV, walking her home, and then arriving back at his dormitory to find both SB and CB in Roe's room. Doe said CB was only there for 5-10 minutes, but Doe did not recall talking to CB at all. Doe said that he and SB thereafter took care of Roe while she vomited, and they ultimately put her to bed together. Doe then told SB he would stay with Roe, and SB left.

- YV said she left the party with Roe and SB and that she had to "physically carry [Roe] because she could not walk," but then YV separated from them in order to get her coat. YV reported running into Doe on her way back to get her coat.

- FM, who lived in Doe and Roe's dorm, recalled a night – which he later identified as the night of December 5-6, 2014 – on which he saw CB and SB "dragging the Complainant back to her room." CB "stayed for a while then left." FM believed that SB "stayed with [the Complainant], and then [the Respondent] came." FM did not have a "super clear" memory of who was present at what point, however.

140.    It is not surprising that many of these witnesses did not have a clear memory of the details around who walked home with Roe, who was with her in her room, and who played

what role when; by the time the witnesses were interviewed, nearly six months had passed since that night, and perhaps more importantly, some of the witnesses had been drinking alcohol that night.

141.    Roe was, by nearly all accounts, extremely intoxicated; SB was "definitely tipsy" (and in fact, text messages between YV and Doe indicate SB was drinking heavily); and YV was "very drunk," having had somewhere in the neighborhood of 10 drinks and having thrown up that night herself.

142.    Affel concluded her investigation on July 2, 2015.

143.    The parties were permitted to review the evidence Affel gathered in the course of her investigation and to submit responses to that evidence.

144.    Affel did not append, to the evidence, information concerning the details of the polygraph examination administered to Doe on May 10, despite having access to those details.

145.    Affel also denied Doe's request to access the aforementioned information. When Doe contacted CUPD concerning the results of the polygraph examination, CUPD informed him that the results were in Affel's possession. When Doe attempted to get the results from the Cortland Police Department, Affel intervened, telling the police that there was an ongoing, active investigation at Cornell. Indeed, Cornell *never* provided Doe with the full results of the polygraph examination; he eventually obtained them from the Cortland Police Department after his suspension.

### *Investigator's Report and Recommendation*

146.    On July 15, 2015, Affel issued her Investigative Report. According to Affel, after investigation, a preponderance of evidence supported the conclusion that Doe kissed Roe,

touched Roe's breasts, touched Roe's genitals outside of her underwear, and put his penis in Roe's mouth, all without Roe's consent.

147.    Affel thus recommended Doe be found responsible for committing acts of sexual violence in violation of Policy 6.4 and that he be either expelled or suspended with conditions.

### A.  **Affel's Biased and Unsupportable Credibility Determinations**

148.    As Affel noted, the accounts of what occurred between Roe and Doe on December 6, 2015, are "irreconcilably inconsistent."

149.    Affel noted that both parties were essentially consistent in their respective descriptions of what occurred that night, and that the witnesses who knew the allegations "testified both that they did not think [Doe] would do what they understood him to be accused of, but that they also did not know why [Roe] would lie."

150.    Thus, the question of responsibility ultimately became a credibility contest.

151.    Affel – a former Massachusetts prosecutor in the Domestic Violence Unit  – "was guided by" and drew "heavily from" Massachusetts and New York model criminal jury instructions concerning factors relevant to assessing credibility.

152.    On information and belief, Affel was also guided by, and drew heavily from, her own biased assumptions about female accusers and male accused (and, in particular, about Doe).

153.    According to Affel, Doe's "tone" with Roe was "patronizing" and "condescending," and his "relationship dynamic" and "choice of language" with Roe were "notable in the extent to which [they are] unusually paternal to the point of being patronizing or demeaning." In Affel's estimation, these things reflected negatively on Doe's credibility

154. Specifically, Affel pointed to the fact that Doe used a soft voice and called Roe "sweetheart" during the controlled call; that he sometimes referred to Roe as his "son"; and that Doe talked about being proud of Roe's achievements, which Affel deemed "unusually paternal."

155. The objective, undisputed facts refute Affel's biased characterizations of Doe's interactions with Roe.

156. Roe called Doe while he was in the library studying for a final exam, and he used a soft voice so as not to disturb those around him.

157. Further, Doe called Roe "sweetheart" during a call in which Roe – one of his closest friends – was quite obviously in distress.

158. Moreover, while it is true that Doe sometimes called Roe as his "son," Roe explicitly told Affel that Doe "called other people that too."

159. Notably, SB also told Affel that Roe "is cute and that she is like a little sister to her." SB described Roe as "sweet."

160. On information and belief, Affel did not characterize SB's comments about Roe's youth and sweetness as "patronizing" or "demeaning" because SB is a female. Conversely, because Doe is male, Affel characterized the exact same sentiments as "patronizing," "demeaning," and "condescending."

161. Alternatively, on information and belief, Affel's characterizations of Doe's demeanor towards Roe as "patronizing," "demeaning" and "condescending" are the product of discriminatory animus based on stereotypical assumptions about South Asian and Muslim men.

162. Specifically, these characterizations are based on the incorrect but pervasive notion that South Asian and Muslim men do not view or treat women as equals.

163.    In fact, when one of the witnesses, AR, mentioned Doe's Muslim faith to Affel during the course of her interview, Affel immediately began asking AR questions about Doe's level of respect for women.

164.    Affel also attempted to justify her credibility determinations by pointing to what even she admitted were "minute inconsistencies" in Doe's testimony – such as whether he discussed his grades with people, and whether he said he was "seeing" someone or whether he said she was his "girlfriend" – as evidence of Doe's alleged lack of credibility.

165.    Likewise, Affel seized on Doe's statements regarding the *approximate* time he left Roe's room – 6 a.m. – and compared that time with "the astronomical data" in order to reach the conclusion that Doe was not being truthful about what time he left Roe's room because it could not have yet been light, as Doe indicated it was.

166.    Yet Doe was clear that he was *estimating* the time he left Roe's room. This did not make him unique among the witnesses; each gave estimates concerning what time certain events occurred. Unlike Doe, however, none of the other witnesses' statements concerning approximate times received the same level of scrutiny from Affel.

167.    For example, SB, a female witness, *estimated* that she returned to Roe's room "around 9 a.m." to check on her, and claimed the room was dark.

168.    According to Affel's "astronomical data," "civil twilight began at 6:49 a.m. and sunrise began at 7:21 a.m."

169.    Thus, even if the blinds were drawn in Roe's room, it is highly unlikely the room was dark at 9 a.m.

170.    Affel did not apply the same "astronomical data" to SB's approximations that she applied to Doe's, however, nor did she explain why the data was relevant only to Doe's time estimates and not to SB's estimates.

171.    As evidenced by the contents of the Investigative Report, Affel applied a higher level of scrutiny and skepticism to the testimony of male witnesses, including Doe, than she did to the testimony of female witnesses.

172.    Indeed, in sharp contrast to the microscopic lens under which Affel examined Doe's testimony, Affel appeared to take Roe's testimony at face value, even though Roe's testimony also contained "minute inconsistences" and, indeed, much more significant and troubling inconsistencies and red flags, such as:

- Whether Roe had any independent memory of the events in her room prior to Doe's arrival, or whether she was relying entirely upon what SB told her (Roe gave conflicting accounts as to which it was);

- Whether Roe had "blacked out" on the night in question (as she told her friends in the days following the December 5 party) or "passed out" (as she claimed when she was interviewed by Affel);

- The fact that Roe failed to disclose, during her first interview with Affel, that she continued to be friends with Doe after December 5-6, 2014, including, without limitation, sending him friendly texts and Facebook messages, confiding in him about family and personal matters; and trusting him to attend at least one other party with her at which she got similarly heavily intoxicated, and from which Doe and others had to walk her home; and

- The fact that Roe misled her friends and CUPD officers into thinking she had been admitted to medical school, when in fact she had been admitted to a graduate program.

173.    On information and belief, Affel was simply intent upon finding Doe, the male respondent, less credible than his female accuser, even though the evidence did not support such a finding and even though there were serious and unresolved questions about Roe's credibility.

28

174.    Affel also acknowledged that the witnesses' testimony concerning what occurred once SB brought Roe to her room was, like the testimony about what happened after that, "irreconcilably inconsistent."

175.    Affel nevertheless ultimately concluded that Doe's testimony in that regard was "contradicted by [CB], [SB], and [Roe]," and was therefore less credible.

176.    The witnesses' testimony does not support this finding, however.

177.    Doe's testimony was not "contradicted" by CB; CB said that Doe "reappeared" in the dorm at some point, but he could not remember when.

178.    Likewise, Doe's testimony was not "contradicted" by Roe; Roe simply had no memory of the events that occurred in her room, and was relying on SB's recitation.

179.    Thus, only the version of events that "contradicted" Doe's is the version SB provided to the Investigator. This version was no more objectively reliable than Doe's version, however.

180.    Consistent with Affel's practice of applying less scrutiny to the testimony of female witnesses than male witnesses, Affel did not even acknowledge, in her report, inconsistencies in SB's statements; SB's level of intoxication; or SB's motive to alter her version of events to cover her own deficiencies as an RA.

181.    In the first place, SB had previously told JA, her Assistant House Dean, that she was in the room with Roe while Roe was throwing up, that "[Doe] was there too," and that she "finally" agreed to let Doe take care of Roe and left. This account – given the same day Roe reported the alleged assault to SB – suggests Doe was in the room with SB for some period of time, which is consistent with Doe's account.

182.   Indeed, it was not until SB spoke with Affel that she denied Doe was in the room for any significant period of time.

183.   Affel, at all relevant times, was in possession of JA's statement concerning what SB reported to him concerning the night in question.

184.   On information and belief, Affel willfully disregarded JA's statement because it tended to bolster Doe's credibility by confirming that SB told him Doe was "there too" while Roe was throwing up.

185.   Furthermore, SB's credibility was seriously diminished by her unwillingness to be forthright with the investigator concerning alcohol consumption.

186.   Specifically, although SB would only admit to being "tipsy" that night, there was evidence – in the form of contemporaneous text messages between YV and Doe – that SB had in fact been drinking quite a bit. YV even referred to SB as a "pro drinker."

187.   Moreover, SB not only minimized her own level of intoxication; she also tried to downplay *Roe's* level of intoxication, even though every other witness to have seen Roe that night described her as highly intoxicated: she was unable to walk on her own, she was slurring her words, and she was vomiting. As set forth above, and on information and belief, SB had a personal interest in downplaying Roe's intoxicated state.

188.   On information and belief, Affel ignored the problems with SB's credibility for the same reason she ignored the problems with Roe's credibility: she was intent on finding the accused male responsible, even when the weight of the evidence did not point to his responsibility.

189.    In fact, the only witness Affel interviewed who saw both Doe and Roe on the night in question and who was not reported to have been drinking *any* alcohol was FA, who lived in the same dormitory as Roe and Doe.

190.    FA's testimony was largely consistent with Doe's. According to FA, he remembered a night on which Roe came back to the dorm and "there were two people dragging [her] back to her room." He described Roe as being "out of it" and "not aware of her situation." FA remembered that the two people with Roe were SB and CB; he said CB "stayed around for awhile then left," and that SB "stayed with [Roe], and then [the Respondent] came."

191.    Despite this being one of the only accounts of the night *not* tainted at least in some way by alcohol, Affel largely discounted FA's testimony because she believed FA "may have been motivated to provide testimony that he believed would aid the Respondent," and because of his purportedly "negative characterization of the Complainant[.]"

192.    Yet in his interview, FA said he "did not see the Complainant as the type of person who would lie"; that he "did not want to choose sides right now because they are both his friends"; and characterized Roe in a largely positive light, remarking that she was a "good person" who "never says anything bad to anyone."

193.    There was thus no support for Affel's contention that FA was somehow, through his testimony, trying to help Doe, or that he sought to portray Roe in a negative light.

194.    Affel also questioned CB's credibility because CB said he agreed to give a statement to "defend" Doe.

195.    By contrast, Affel made no such similar assessment of YV's credibility, even though when YV spoke to police on May 19, 2015, she was clear that her intent in doing so was to "help [Roe]."

196.     Affel engaged in an arbitrary and capricious pattern of discrediting witnesses associated with Doe, the male respondent, and crediting witnesses associated with Roe, the female complainant, even though there was no rational basis for doing so.

## B.   Affel Improperly Relied on Irrelevant and Highly Prejudicial Evidence

197.     Affel also "considered and gave some weight to the Respondent's conduct with [YV] on December 5-6, 2014." Affel reasoned that because Doe and YV's testimony concerning the conduct was inconsistent, these inconsistencies reflected on Doe's credibility, and further reasoned that "the conduct reflects on the Respondent's state of mind when he returned" to his dorm on December 6.

198.     Neither rationale is supportable, however, and the evidence amounted to nothing more than improper "prior bad acts" evidence.

199.     The conduct at issue involved mutual touching and kissing between YV and Doe. Just as he had with the police, Doe admitted in his interview with Affel to touching and kissing YV.

200.     YV also admitted to kissing Doe, although she at times described at least some of the conduct as unwanted, and this is primarily where Doe and YV's accounts diverged.

201.     Affel described this divergence as "yet another example of a witness account contradicting the Respondent's description of the evening," thereby, in Affel's estimation, detracting from Doe's overall credibility.

202.     Affel failed to mention that YV's memory of the night in question was likely highly impaired by alcohol, however, since by YV's own admission she was "very drunk," having had at least 10 alcoholic beverages.

203.     Thus, YV's version of events certainly did not warrant more credit than Doe's.

204.    Moreover, Affel failed utterly to explain how Doe's interactions with YV "reflect[s] on the Respondent's state of mind when he returned" to his dorm in the early morning hours after walking YV home.

205.    Affel noted only that Doe "pursued [YV] – who he had only met moments before and with whom he had only exchanged just bare pleasantries – by kissing her and touching her breasts. While there could be a romantic or culturally normative interpretation of this behavior, it appears on its face to be entitled and disrespectful."

206.    This is not "state of mind" evidence. Rather, it is evidence meant to reflect poorly upon Doe's character.

207.    Moreover, labeling Doe's behavior with YV as "entitled and disrespectful" once again evidences Affel's gender-biased assumptions concerning interactions between men and women (*i.e.*, the need to protect intoxicated women from purportedly predatory men).

208.    Alternatively, labeling Doe's behavior in this manner evidences Affel's racially- and religiously-biased assumptions (*i.e.*, that South Asian and Muslim men look down upon women and therefore treat them with less respect).

209.    On information and belief, Affel willfully failed to mention in her report that, on the afternoon of December 6, 2014, following their prior late-night interaction, YV and Doe had a lengthy and friendly text conversation about drinking the previous evening, as well as their respective classes and majors.

210.    The conversation ended with Doe asking YV if she wanted to meet up sometime that week for coffee or a meal. YV responded enthusiastically, and the two met up on December 8, 2014.

211.     At all relevant times, Affel had these text messages at her disposal, was aware of their contents, and willfully, arbitrarily and capriciously chose to disregard them.

212.     Whatever Affel's personal opinions about the fact that Doe and YV engaged in mutual touching and kissing after having just met, YV clearly did not view Doe as "entitled and disrespectful." Rather, as evidenced by the aforementioned text conversation, YV viewed Doe as someone with whom she was perfectly willing to socialize again.

### C. Affel's Conclusions Regarding Alcohol Impairment

213.     As set forth above, several of the witnesses reported consuming alcohol on the night in question.

214.     In addition, two of the witnesses whose accounts Affel explicitly credited – YV and Roe – admitted to a high level of intoxication.

215.     YV said she was "very drunk" and acknowledged having consumed at least 10 alcoholic beverages, including shots of hard liquor.

216.     It was virtually undisputed that Roe was so drunk she was throwing up and could not even walk unassisted. Furthermore, Roe had no independent memory of SB taking care of her once she got back to her dorm room.

217.     Incredibly, in the face of all of this evidence, Affel concluded that "the investigation did not give rise to concern that the witnesses or parties were so intoxicated that they could not remember the events of the evening or that their present memories of significant events could not be relied upon."

218.     Common sense dictates that a person who is "very drunk" and has consumed at least 10 alcoholic drinks will not have a reliable memory of events that transpired while she was under the influence of that much alcohol.

34

219.    Common sense likewise dictates that a person who is so intoxicated that she cannot walk on her own, so intoxicated that she is vomiting, and so intoxicated that she is incoherent and apparently unaware of her surroundings, and so intoxicated that she passes out, is not likely to give a reliable account of events that transpired while she was so heavily under the influence of alcohol.

220.    The only possible explanation for Affel's willful blindness to the acute influence alcohol had on certain witnesses' recollections of events is that she was determined to find Doe responsible for sexual violence because a young, vulnerable female had accused him of such violence, and to find otherwise would be to fail to protect that young, vulnerable female.

### D.  Affel Improperly Disregarded Critical Evidence of Doe's Innocence

221.    At the same time that Affel relied upon unfounded credibility determinations, as well as clearly irrelevant and highly prejudicial evidence, to reach the conclusion that Doe was capable of and responsible for committing acts of sexual violence, she wholly disregarded critical evidence pointing to his actual innocence.

222.    As set forth above, the police administered to Doe a polygraph examination on May 10, 2015. The examination, called a "You Phase" exam, consisted of a number of questions designed to establish certain baselines, and two questions concerning the events at issue, each of which was phrased differently but was designed to determine whether Doe put his penis in Roe's mouth (the most serious allegation against him).

223.    The polygraph examination revealed no deception in Doe's answers.

224.    Nevertheless, Affel chose not to "give the result of that report *any weight* in this analysis." (Emphasis added.)

225.    Affel reasoned, first, that "the results of a polygraph are generally not admissible in court[.]"

226.    Aside from being a misstatement of the "general" admissibility of polygraphs, this reason is somewhat ironic given that Affel was content to consider a plethora of other evidence that is "generally not admissible in court", including hearsay, double hearsay, and "bad act" evidence. She did so without acknowledging what she clearly already knew from her training as a prosecutor: in court, that evidence is largely considered unreliable and/or prejudicial.

227.    Moreover, as evidenced by the fact that many law enforcement agencies, including CUPD, routinely administer polygraph examinations to suspects, the examination and results are clearly accepted as valuable investigative tools.

228.    In fact, Cornell itself – through its own police department – was the entity that urged Doe to take the polygraph examination and arranged, in cooperation with the Cortland Police Department, for its administration.

229.    Cornell's decision, through Affel, to disregard an examination it had not only condoned but had essentially ordered was therefore arbitrary and capricious.

230.    Affel also disregarded the results of the polygraph because "the Respondent was only asked two questions relevant to the alleged sexual violence and both questions were limited to whether or not he put his penis in the Complainant's mouth."

231.    On information and belief, Affel, a former criminal prosecutor, understood that this is a standard method for administering these types of examinations.

232.    Likewise, Affel understood that the absence of certain questions in no way detracts from the relevance of the questions that were asked.

233.   Here, the examiner asked Doe about the most serious of Roe's allegations – the alleged oral penetration – and the results indicated Doe was answering truthfully when he denied those allegations.

234.   Affel's decision to disregard the polygraph on this basis was, likewise, arbitrary and capricious.

### X.      The Report of the Reviewers – Doe is Suspended

235.   On September 24, 2015 – over four months after the investigation first commenced – Doe received the Reviewers' Report.

236.   The Reviewers' Report was based entirely on documentary evidence consisting of Affel's Investigative Report; the information appended thereto; and the parties' written submissions.

237.   The Reviewers never met with the parties or the witnesses, and never independently assessed their credibility. Instead, they relied solely on Affel's credibility assessments.

238.   As set forth above, Affel's credibility assessments were flawed and unsupportable, and the clear product of a deeply-held bias in favor of female complainants and against male respondents.

239.   The Reviewers "unanimously [found] that there is a preponderance of evidence that the Respondent committed four acts of sexual violence against the Complainant[.]"

240.   The Reviewers also found "no reason to suspect that the report and/or the investigative process were inherently biased against the Respondent," though the Reviewers offer no real rationale to support this conclusion.

241.     Finally, the Reviewers dismissed, without any explanation, Doe's suggestions that Roe's memory was impaired and/or distorted by her excessive alcohol consumption on the night in question. They simply stated that there was "no evidence" of such an impairment.

242.     Consequently, the Reviewers recommended that Doe be suspended from the University for a minimum of two calendar years, during which time he had to meet a number of conditions, including:

- A psychological assessment by a licensed mental health professional;

- An Alcohol or Other Drug (AOD) assessment by a licensed AOD professional;

- Completion of an appropriate counseling program based on the AOD assessment;

- On-Campus Substance Abuse and Mental Health Examination; and

- Directed Study in Consent and Communication.

243.     After his two-year suspension, Doe was eligible to apply for readmission at the University, but had to demonstrate "that he would not re-offend."

244.     Doe filed a timely appeal.

245.     In addition, on September 25, 2015, and again on September 26, 2015, Doe requested a stay pending his appeal of the Reviewers' decision. Doe pointed out that because the process took over four months to complete, he had already paid for tuition and housing for the Fall 2015 semester and had already begun taking classes.

246.     Cornell denied Doe's request for a stay.

247.     On December 11, 2015, nearly three months after Doe filed his appeal, a review panel led by the Vice President for Student and Campus Life ("VPSCL") issued a final decision in Doe's case.

38

248.    Even though Cornell was already significantly revising Policy 6.4 in order to comport with the requirements of Art. 129-B law – including by implementing a hearing system that incorporates the basic due process protections lacking under the then-existing Policy 6.4 – the review panel noted its purported disagreement with Doe's argument that "the current process is one-sided [and] fundamentally unfair."

249.    Doe was provided some measure of relief on appeal, however. The review panel "determined that in order to better align with precedent, the term of suspension from the university has been reduced to a minimum of one year . . . ."

250.    Doe's transcript notes that he was suspended for a year "after a finding [of] responsibility for a conduct violation."

### XI.    Doe's Complaint of Bias/Discrimination

251.    On March 21, 2016, Doe filed a complaint of bias/discrimination with the SUNY Office of Diversity, Equity and Inclusion ("ODEI"), alleging that Cornell treated him unfairly on account of his gender, race, creed, national origin, and religion.

252.    An officer at the ODEI informed Doe that Cornell was responsible for investigating the complaint. The officer e-mailed Kathee Shaff at Cornell's Department of Inclusion and Workforce Diversity, informed Ms. Shaff of Doe's complaint, and provided Ms. Shaff with Doe's contact information.

253.    Doe placed calls to Ms. Shaff and her office on March 23 and 24, 2016. Each time, Doe left a voicemail asking for someone to return his call or direct him to the appropriate person or department.

254.    No one from Cornell returned Doe's calls.

255.   On March 25, 2016, Doe was able to reach someone from the Department of Inclusion and Workforce Diversity's help desk. That person said the office could not speak to Doe about his claims.

256.   To date, no one from Cornell has contacted Doe about his claims of bias/discrimination or otherwise acted upon them.

257.   As a result of Defendants' unlawful actions, Doe has suffered extreme emotional and psychological distress. Incredibly, Affel initially discouraged Doe from seeking counseling by telling him that sharing information from the investigation with anyone, including a therapist, could result in another policy violation. Nevertheless, the stress was too great for Doe and he had no choice but to engage a mental health counselor to help him through the experience. After his suspension, Doe was unable to see a light at the end of the tunnel and seriously contemplated suicide. He spent a considerable amount of time in therapy for his suicidal ideations, and was even admitted to a psychiatric ward for several days due to his suicidal thoughts. Prior to his involvement in the above-described process, he had no psychiatric issues at all.

258.   Doe was also unable to take college courses that would count towards his major, or to secure meaningful employment, during the term of his suspension. Because of the notation on his transcript, Doe's chances of getting into medical school are severely diminished, thus putting his future career plans in jeopardy.

## AS AND FOR A FIRST CAUSE OF ACTION
## Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
## Erroneous Outcome

259.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

40

260.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

261.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Cornell.

262.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

263.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[3]

264.     In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

---

[3] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

265.     According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also, in the case of state colleges such as the College of Agriculture and Life Sciences, *"[accord] due process to both parties involved..."*[4]

266.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[5]

267.     A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[6]

268.     An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed a violation of Cornell's policies, and gender bias was a motivating factor.

269.     Based on the foregoing, Defendant Cornell failed to conduct an adequate, reliable, and impartial investigation.

---

[4] *Id.* at 22 (emphasis added).

[5] *Id.* at 20.

[6] *Id.* at 21.

270.    Cornell's discriminatory process deprived John Doe, a male student, of educational opportunities at Cornell on the basis of his sex.

271.    Cornell erroneously found Doe responsible for sexual misconduct despite the absence of any reliable or credible evidence.

272.    Cornell applied its stated Policies and procedures and gender-biased practices in a manner that discriminated against Doe on the basis of his sex and led to an erroneous and adverse outcome.

273.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include, without limitation:

a.  The Investigator credited the accounts of two female witnesses and the alleged victim, despite the fact that all three were impaired by alcohol on the night in question, and discredited the accounts of at least two male witnesses who were not impaired by alcohol, but whom the Investigator nevertheless openly and erroneously presumed were offering biased testimony for the purpose of "defending" Doe;

b.  The Investigator employed a different and gender-based standard when evaluating witness testimony and demeanor, including, but not limited to, characterizing Doe's protective nature vis-à-vis Roe as "patronizing," "demeaning," and "condescending," while failing to similarly characterize SB's protective nature vis-à-vis Roe; and scrutinizing the testimony of male witnesses to a much greater degree than the testimony of female witnesses;

c.  The Investigator included highly prejudicial information concerning Plaintiff's prior sexual conduct in the Investigative Report in an effort to provide further support for Roe's claims, and evaluated that highly prejudicial information using archaic and outdated assumptions about sexual contact between men and women, including, but not limited to, assuming that if a man has sexual contact with a woman after he has just met her, he is "entitled and disrespectful"; and

d.  The Investigator inexplicably refused to acknowledge Roe's undisputedly high level of intoxication and the clear effect that level of intoxication had on Roe's memory, because to so acknowledge would have substantially diminished Roe's credibility, and therefore decreased the likelihood that Doe, a male, would be found responsible for sexually assaulting Roe, a young and vulnerable female.

274.    Upon information and belief, Cornell was encouraged by federal officials to institute solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

275.    Upon information and belief, Cornell's mishandling of the Complaint was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

276.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

277.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

278.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract

279.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

280.    Doe applied to and enrolled in the University and paid associated fees and expenses. Doe did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including but not limited to the Code of Conduct and Policy 6.4.

44

281.     An express contract or, alternatively, a contract implied in law or in fact was formed between Doe and the University.

282.     The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

283.     Based on the aforementioned facts and circumstances, Defendant breached its express and/or implied agreement(s) with John Doe, and the covenant of good faith and fair dealing contained therein.

284.     Defendant committed several breaches of its agreements with John Doe during the investigation and hearing process. A non-exhaustive list of Defendant's breaches includes the following:

**Failure to Conduct Impartial Investigation**

285.     Cornell's Policy 6.4 provides that investigators are required to "undertake to resolve [complaints] impartially, promptly, and confidentially…"

286.     Defendant failed to conduct an impartial investigation when Defendant:

- Evaluated the witnesses' testimony in a biased and discriminatory matter, as more fully set forth above, resulting in unsupportable credibility determinations and findings;

- Considered irrelevant and highly prejudicial information concerning Doe's other sexual encounters, as more fully set forth above, which amounted to nothing more than evidence meant to impugn Doe's character;

- Refused to consider, in any manner, evidence that exculpated Doe, namely, the results of a polygraph examination indicating that Doe truthfully denied sexually assaulting Roe; and

- Failed to consider or acknowledge the level of intoxication of three "key" female witnesses, and likewise failed to consider or acknowledge the impact such intoxication had on the witnesses' memories.

287.    Defendant's failure to conduct an impartial investigation breached the contract with Doe and the implied covenant of good faith and fair dealing contained therein.

**<u>Failure to Follow Policy for Handling Complaints of Bias</u>**

288.    Cornell defines a bias incident as "an act of bigotry, harassment, or intimidation that occurs on the Cornell campus or within an area that impacts the Cornell community and that one could reasonably conclude is directed at a member or a group of the Cornell community because of that individual's or group's actual or perceived age, color, creed, disability, ethnicity, gender, gender identity or expression, marital status, national origin, race, religion, sexual orientation, veteran status, or any combination of these or related factors."

289.    Cornell defines a bias/discrimination complaint as a "complaint [that] calls for action or treatment in response to alleged bias/discriminatory activity directed against an individual because of that individual's actual or perceived age, color, creed, disability, ethnicity, ex-offender status, gender, gender identity or expression, marital status, national origin, race, religion, sexual orientation, veteran status, or any combination of these factors."

290.    When an individual makes a bias/discrimination complaint, Cornell is required, per its own policies, to do the following: "Appropriate involvement/communication from the Reporting Bias System staff in the Department of Inclusion and Workforce Diversity (DIWD)"; "Intervention with the agent, target, and witness(es) of the bias activity with assistance from the Bias Assessment & Review Team (BART), which includes the Office of the Judicial Administrator, Office of Workforce Policy and Labor Relations, and Cornell University Police"; and "[f]ollow up with the reporting person if desired."

291.    BART is responsible for "assess[ing] all documented bias incidents in a timely manner to determine the appropriate response, and . . . complet[ing] intervention steps in conjunction with the appropriate campus partners as necessary."

292.    Doe made a complaint of bias/discrimination against Cornell and its agents/employees.

293.    Cornell was aware of the complaint, which was sent to Cornell's Department of Inclusion and Workforce Diversity by the ODEI on March 21, 2016.

294.    Cornell failed to communicate with Doe about the complaint; assess the complaint; intervene with the agent, target and witnesses; and follow up with Doe.

295.    Defendant's failure to take the above-mentioned steps in connection with Doe's complaint of bias/discrimination breached the contract with Doe and the implied covenant of good faith and fair dealing contained therein.

296.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

297.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.

### AND AS FOR A THIRD CAUSE OF ACTION
### Breach of Contract/Common Law: Denial of Basic Fairness/
### Arbitrary and Capricious Decision Making

298.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

299.    Defendant had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against John Doe were conducted in good faith and with basic fairness.

300.    Defendant breached this duty of good faith and basic fairness by, without limitation:

- Arbitrarily and capriciously applying different and gender-based standards to witness testimony, including, but not limited to, crediting the testimony of three female witnesses who were significantly impaired by alcohol on the night in question; discrediting the testimony of two unimpaired male witnesses on the sole basis that those witnesses were providing testimony to "defend" Doe; viewing the same protective attitude towards Roe differently depending upon the gender of the person exhibiting the protective attitude; and making archaic assumptions about the propriety of sexual interactions between a man and woman who have just met;

- Arbitrarily and capriciously relying upon "prior bad act" evidence, the sole purpose of which was to portray Doe in a negative and derogatory light;

- Arbitrarily and capriciously excluding exculpatory information (the results of the polygraph examination) from the investigation and decision-making process, and denying Doe access to that information;

- Failing to provide John Doe the opportunity to confront and cross-examine witnesses at a fair hearing, when basic fairness demands such a hearing;

- Failing to remand the matter for an evidentiary hearing after Art. 129-B, which was passed during the pendency of Doe's case, made clear that accused students should have a right to such a hearing "where appropriate," and even though Defendants were at all times capable of affording Doe such a hearing; and

- Arbitrarily and capriciously suspending Doe.

301.    Defendant's breach of the duty to ensure basic fairness proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

302.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Violation of New York State Human Rights Law

303.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

304.     Defendant Cornell is an education corporation organized and operating as such under the laws of the State of New York.

305.     The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

306.     Based on the foregoing, Cornell permitted discrimination against John Doe on the basis of his sex.

307.     Alternatively, based on the foregoing, Cornell permitted discrimination against John Doe on the basis of his race, national origin, and religion.

308.     Based on the foregoing, Cornell authorized, condoned and/or acquiesced to discriminatory conduct against John Doe.

309.     Based on the foregoing, Cornell knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

310.     Based on the foregoing facts and circumstances, Cornell engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

311.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

312.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iii)    on the third cause of action for denial of basic fairness under contract and common law, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects; and

(iv)      on the fourth cause of action under New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)      a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Cornell should be reversed; (ii) Plaintiff's reputation should be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion be removed from his education file; and (v) any record of the complaint against Plaintiff be permanently destroyed;

(vi)      an injunction directing Cornell to: (i) reverse the outcome and findings regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; and (iv) permanently destroy any record of Roe's complaint; and

(vii)      awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         November 21, 2017

                                        Respectfully submitted,

                                        NESENOFF & MILTENBERG, LLP
                                        *Attorneys for Plaintiff*


                                        By:*/s/ Andrew T. Miltenberg*
                                        **Andrew T. Miltenberg, Esq. (517014)**
                                        **Tara J. Davis, Esq. (519928)**
                                        **Stuart Bernstein, Esq. (520831)**
                                        **363 Seventh Avenue, Fifth Floor**
                                        **New York, New York 10001**
                                        **(212) 736-4500**
                                        **amiltenberg@nmllplaw.com**
                                        **tdavis@nmllplaw.com**
                                        **sbernstein@nmllplaw.com**